**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SUMMERHAVEN INVESTMENT MANAGEMENT, LLC, et al., | : | |
| Plaintiffs, | : | CIVIL CASE NO. |
| | : | 3:21-cv-1639 |
| v. | : | |
| | : | |
| JOSEPH SCHULTZ, | : | |
| Defendant. | : | AUGUST 3, 2022 |
| | : | |

**RULING ON DEFENDANT'S MOTION TO DISMISS (DOC. NO. 23) AND
DEFENDANT'S MOTION TO SEAL EXHIBITS (DOC. NO. 21)**

**I.      INTRODUCTION**

Plaintiffs SummerHaven Investment Management, LLC, SummerHaven Index

Management, LLC, SummerHaven Capital, LLC, (collectively, "SummerHaven") bring

this suit against Joseph Schultz ("Schultz") for actions he took, and failed to take, while

he served as their Chief Compliance Officer ("CCO") and Chief Financial Officer

("CFO").  Am. Compl. ("Compl.") at ¶ 1 (Doc. No. 18).  Schultz moves to dismiss the

Complaint in its entirety.  See Mot. to Dismiss ("Def.'s Mot.") (Doc. No. 23); Mem. of

Law in Support of Def.'s Mot. to Dismiss ("Def.'s Mem.") (Doc. No. 23-1); see also Reply

to Obj. to Mot. to Dismiss ("Def.'s Reply") (Doc. No. 26).  SummerHaven opposes this

Motion.  See Obj. to Def.'s Mot. to Dismiss ("Pl.'s Mem.") (Doc. No. 25).  Schultz also

moves to seal the exhibits submitted with his Motion to Dismiss.  See Def.'s Mot. to Seal

Ex. to Mem. in Support of Mot. to Dismiss ("Mot. to Seal") (Doc. No. 21).

For the reasons discussed below, the Motion to Dismiss (Doc. No. 23) is denied,

and the Motion to Seal (Doc. No. 21) is granted in part.

1

II.      ALLEGED FACTS

SummerHaven is "in the business of investing funds placed with them by clients,

often institutional investors such as pension funds, endowments, and foundations", and

invests in "commodities futures and private equity replication strategies."  Compl. at ¶ 8

(Doc. No. 18).  Schultz's position as CCO and CFO for SummerHaven, which he held

"from 2011 through his departure on December 31, 2019", gave him "the authority to

block any action by others in the firm, including its members and other officers, that

would violate the laws enforced by the [Commodities Futures Trading Commission

("CFTC")] and other regulatory agencies that oversee the firm."  Id. at ¶¶ 10, 14.

Schultz's position as CCO required him to, inter alia, "maintain familiarity with the

Commodity Exchange Act and other laws enforced upon [SummerHaven] by the CFTC

and other regulators, and to ensure that [SummerHaven]'s investment activities

complied with those laws", which sometimes meant "instructing others on those laws,

preventing anticipated violations[,] and investigating and redressing violations that had

already occurred."  Id. at ¶ 13. Critically, SummerHaven alleges that:

> Schultz owed a duty to the firm and all of its principals to inform them of any
> impending transactions by the firm of which he became aware that would
> violate the law, so that he and they could attempt to prevent such
> transactions, and to inform them of any existing violations of which he
> became aware, so that he and they could attempt to remediate such
> violations and could make any necessary reports of the violations to
> investors, regulators, and others.

Compl. at ¶ 15 (Doc. No. 18).  SummerHaven alleges that Schultz did not uphold these

duties, to SummerHaven's detriment, in three key ways: (1) by permitting illegal wash

2

sales[1] on the Intercontinental Exchange and the Chicago Mercantile Exchange ("CME"), and later failing to report said sales despite being informed by the CME that they were illegal and despite cooperating in the SEC's subsequent "limited scope examination" of SummerHaven's activities; (2) by approving and facilitating the sale of a 20% ownership interest in Digital Swiss Gold ("DSG"), a wholly-owned subsidiary of SummerHaven, to a family business of SummerHaven's then-Chief Executive Officer (CEO), Ashraf Rizvi ("Rizvi"), and failing to inform SummerHaven of said sale; and (3) failing again to inform SummerHaven of any of this when, in November 2019, Schultz entered negotiations with SummerHaven to terminate his membership with the corporations and withdraw as CCO and CFO.  See Compl. at ¶¶ 18–24, 33–35, 42 (Doc. No. 18).

SummerHaven emphasizes that, during his negotiations to withdraw as CCO and CFO, Schultz had a "duty to disclose whether he had any debts or liabilities to the firm, and if so, what they were."  Id. at ¶ 40.  Rather than fulfill that duty, SummerHaven alleges that Schultz "concealed or otherwise failed to disclose that he was liable to SummerHaven in at least two ways: for permitting the . . . illegal wash sales, and for permitting and facilitating the transfer of a portion of [DSG] to Rizvi['s unaffiliated family business]."  Id. at ¶ 41. SummerHaven alleges that if its principals "had knowledge of the illegal wash sale or the transfer of a portion of [DSG] to Rizvi['s family company]", they "never would have agreed to the terms" of the agreements that followed.  Id. at ¶ 43.

---

[1] SummerHaven explains in its Complaint that wash sales are "transaction[s] in which an investor executes offsetting trades of parallel commodity positions – one sale and one purchase – contemporaneously, creating the appearance of trading activity without taking on genuine market risk", and that the Commodity Exchange Act's law prohibiting this type of sale is "well-known[.]"  Compl. at ¶ 17 (Doc. No. 18).

While allegedly concealing these activities, Schultz entered into three agreements with SummerHaven pursuant to his withdrawal and termination of membership: (1) a Side Letter, in which DSG "was spun off from [SummerHaven] to Schultz and Rizvi in exchange for a promise that Rizvi and Schultz would repay $250,000 to SummerHaven . . ."; (2) a Promissory Note and Security Agreement from SummerHaven to Schultz for $480,000; and (3) a Withdrawal Agreement.  Id. at ¶ 42. Of critical importance to Schultz's Motion to Dismiss, the Withdrawal Agreement, "governed by and [to be] construed in accordance with the laws of the State of Connecticut," contained a Mutual Release wherein SummerHaven:

> forever unconditionally and irrevocably release[d] and discharge[d Schultz] . . . from any and all Claims[, causes of action, complaints, agreements, promises (express or implied), contracts, undertakings, covenants, guarantees, grievances, liabilities, damages, rights, obligations, expenses, debts, and demands whatsoever, in law or equity, known or unknown, whether present or future, and of whatsoever kind or nature], which SummerHaven . . . ever had, now have or hereafter can, shall or may have for, upon, or by reason of any alleged or actual matter, cause or thing from the beginning of time until the date they sign this agreement, including, but not limited to, those arising out of, in connection with or relating in any way to the terms and conditions of [Schultz]'s membership with SummerHaven, the Operating Agreements, [Schultz]'s services to SummerHaven, and [Schultz]'s withdrawal from SummerHaven.

Withdrawal Agreement, Def.'s Ex. A at 3, 5 (Doc. No. 22).

With the agreements in place, Schulz ended his tenure as CCO and CFO on December 31, 2019.  It was only three days later that SummerHaven "received a notice from the CFTC enforcement division to retain records from 2018", the year in which the illegal wash sales took place.  Compl. at ¶ 44 (Doc. No. 18).  These records were used in the CFTC's investigation, SummerHaven later learned, into the wash sales that Schultz had approved.  Id.  The investigation "eventually culminated in the prosecution

4

of a civil regulatory action by the CFTC against SummerHaven", resulting in a "civil fine

of $500,000" and "other regulatory measures" in May 2021.  Id. at ¶ 45.  SummerHaven

initiated this suit seven months later, on January 23, 2022.  See generally id.

Schultz moved to dismiss SummerHaven's Complaint on January 27, 2021,

arguing that all of SummerHaven's claims are barred by the release contained in the

Withdrawal Agreement.  Def.'s Mot. at 1 (Doc. No. 23).  Schultz also moved to seal the

exhibits attached to the Motion to Dismiss the same day.  See Mot. to Seal (Doc. No.

21).

For the reasons that follow, the court denies Schultz's Motion to Dismiss (Doc.

No. 23), and grants, in part, the Motion to Seal (Doc. No. 21).

## III.   STANDARD OF REVIEW

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)

("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662,

678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully."  Id.  Reviewing a motion to

dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual

allegations in a Complaint as true, and draws all reasonable inferences in the non-

movant's favor.  See La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020).  However, the

court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a

cause of action."  Iqbal, 556 U.S. at 678.

## IV.   DISCUSSION

Schultz moves to dismiss the case on the basis that it is barred by the Mutual

Release in the Withdrawal Agreement signed by SummerHaven.  In addition, he moves

to seal the exhibits "attached to the Memorandum of Law in Support of Motion to

Dismiss Amended Complaint." Mot. to Seal at 1 (Doc. No. 21).

### A.        Motion to Dismiss: Mutual Release as Bar to Suit

Schultz urges that the court dismiss this case because "all of [SummerHaven]'s

claims are barred, as a matter of law, by a release [SummerHaven] issued to Schultz in

connection with the purchase of his membership interests."  Def.'s Mem. at 1 (Doc. No.

23-1).  Schultz explains that the "the Release in the Withdrawal Agreement is clear and

unambiguous, and broadly releases [him] from any and all claims, including claims

arising out of his dealings with [SummerHaven]." Id. at 6.

SummerHaven, in contrast, argues that the Release "does not unambiguously

release the claims asserted in [the] Complaint, all of which sound in fraud or fraudulent

concealment."  Pl.'s Mem. at 1 (Doc. No. 25).  SummerHaven goes on to state that the

provision "does not unambiguously release, or in any way mention, 'fraud' claims", and

that it "is clear that the Signatories to the Withdrawal Agreement did not contemplate the

fraud that Schultz carried out in order to secure more favorable terms for his withdrawal

from he business relationship." Id. . at 1–2

Schultz replies that the phrase "whatsoever kind or nature", used in the release,

is

> all-encompassing; that language (as well as other quoted language)
> evinces an intent to release all possible claims between the parties,
> including the claims [SummerHaven] ha[s] asserted here. Looking at the
> plain language of the Release, it is difficult to imagine more inclusive
> language than that which [SummerHaven] and Schultz used to cover the

6

entirety of their relationship in the Withdrawal Agreement, and specifically
in the Release.

Def.'s Reply at 3 (Doc. No. 26).

Finally, SummerHaven argues that the Release "did not contemplate <u>any</u> existing claims but was itself <u>induced</u>, together with the terms of the Withdrawal Agreement, based on Schultz's fraudulent conduct in attempting to gain more favorable terms." Pl.'s Mem. at 10 (Doc. No. 25) (emphasis added).

As the Withdrawal Agreement explicitly provides, Connecticut law governs the court's analysis here. <u>See</u> Withdrawal Agreement, Def.'s Ex. A at 5. In Connecticut, state courts treat "a release agreement [as] a contract. It is well settled that a release, being a contract whereby a party abandons a claim to a person against whom that claim exists, is subject to rules governing the construction of contracts." <u>Giano v. Salvatore</u>, 136 Conn.App. 834, 841, <u>cert. denied</u>, 307 Conn. 926, (2012). Connecticut courts construe contracts with the goal of giving effect to "the intent of the parties" by looking at "the language used" and "interpret[ing] it in the light of the situation of the parties and the circumstances connected with the transaction." <u>PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.</u>, 267 Conn. 279, 290 (2004) (quoting <u>Poole v. City of Waterbury</u>, 266 Conn. 68, 87–88 (2003)). Thus, if the language used in a contract is "clear and unambiguous, the contract is to be given effect according to its terms." <u>Id.</u>

However, there are exceptions to this rule. <u>See, e.g.</u>, <u>Jay Realty, Inc. v. Ahearn Dev. Corp.</u>, 189 Conn. 52, 55–56 (1983) (outlining exceptions). This includes instances where fraud is alleged: if, for example, a party is able to provide evidence that "tends to show that the contract should be defeated or altered" due to fraud, Connecticut courts will look past contract language, which may otherwise be clear and unambiguous, "on

7

the equitable ground [that] 'relief can be had against any deed or contract in writing founded in mistake or fraud.'" TIE Commc'ns, Inc. v. Kopp, 218 Conn. 281, 289 (1991) (quoting Noble v. Comstock, 3 Conn. 295, 299 (1820)).

Turning to the case at bar, the language of the Withdrawal Agreement's Release is remarkably broad; so much so that nearly <u>any</u> claim would likely fall within its capacious language.  In his attempt to apply New York contract law to this Connecticut-law-bound analysis, however, Schultz misses the fact that SummerHaven is claiming the entire Withdrawal Agreement was procured through fraud and that, as such, it is unenforceable.  Separate and apart from the question of whether the language of the Release contemplates the claims in SummerHaven's Complaint, the question at issue is whether the contract <u>containing</u> the provision is enforceable under Connecticut law.

Schultz tries to avoid this analysis altogether by asking this court to apply a legal doctrine under New York law—not yet adopted by courts in Connecticut—requiring that a claim for fraud otherwise barred by a release provision must be separate from the fraud that allegedly led to the inclusion of said provision in the first place.  Def.'s Mem. at 8–9 (Doc. No. 23-1); see also Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V., 17 N.Y.3d 269 (2011) (applying this "separate fraud" doctrine to a contract governed by New York law).  SummerHaven, on the other hand, correctly points out that this doctrine has not been formally adopted by Connecticut state courts. Pl.'s Mem. at 11 (Doc. No. 25).  Instead, SummerHaven suggests that courts in Connecticut require that "the word fraud or other such unambiguous language" appear in the release provision before a fraud claim can "survive a Rule 12(b)(6) motion[.]"  Id. (citing NovaFund Advisors, LLC v. Capitala Grp., LLC, No. 3:18-CV-1023 (MPS), 2020

WL 230089, at *10 (D. Conn. Jan. 14, 2020)).  What both parties have missed,

surprisingly, is a controlling Connecticut Supreme Court case on the issue before this

court.  See Pacelli Bros. Transp. v. Pacelli, 189 Conn. 401 (1983).  In Pacelli, the Court

addressed the question of whether a general release provision in a Settlement

Agreement, which transferred the defendant's shares to the plaintiffs, barred the

plaintiffs' suit.  The Court's answer was clear: a "general release cannot shield an officer

or director who has failed in his fiduciary duty to disclose information relevant to a

transaction with those whose confidence he has abused[.]"  Id. at 409 (emphasis

added).

  The Pacelli case arose from a dispute between the plaintiffs, brothers Clarence

and Guido Pacelli, and three corporations bearing the same family name, and the

defendant, their brother, Torino, over actions Torino took while he held a fiduciary

position to the principal family corporation.  Id. at 402.  Guido, Clarence, and Torino had

each owned one-third of the three family-run corporations; Torino served as President

of the principal corporation from 1960 until the Settlement was reached in 1974.  Id. at

402, 405.  In the summer of 1974, Clarence and Guido suspected that Torino had been

abusing his position as President for personal gain and decided to "oust Torino as a

director and president of the corporations."  Id. at 404.  Torino brought an action against

his brothers and the three corporations in response seeking, inter alia, to dissolve the

corporations.  Id. at 405.  Guido and Clarence then initiated a separate suit against

Torino, three of Torino's sons, and another corporation allegedly formed by Torino and

his sons "for the purpose of diverting assets and customers" from one of the three

Pacelli family businesses.  Id.

Both cases were resolved when the three Pacelli brothers reached a Settlement

Agreement, memorialized as a stipulated judgment in Torino's action.  Id.  In the

Agreement, Torino agreed to transfer his interest in all three family corporations in

exchange for "$300,000, of which $87,000 would be paid in cash and $213,000 by a

secured promissory interest-bearing note", and a general release of liability.  Id. at 405.

Guido later testified in Pacelli that he entered into the Agreement despite "not know[ing]

the entire background and . . . not trust[ing] Torino[, because] he wanted to get the

whole thing over with."  Id.  About a year after the Agreement was reached, the Pacelli

plaintiffs discovered that Torino, while President of the principal corporation, had

"secretly established another bank account" which he had used, not just for the

corporation, but also for himself and his family.  Id. at 406.  When the plaintiffs

subsequently sued Torino over this, the trial court rendered judgment in Torino's favor

on the basis of the general release. Specifically, the trial court found that "the effect of

the [Settlement Agreement] and general release could not be overcome[.]"  Id.

Like defendant Torino in Pacelli, Schultz was a fiduciary to SummerHaven here.

The Connecticut Supreme Court was particularly critical of Torino's "flagrant breach of

[his] duties as an officer and director of the family corporations."  Id. at 407.  Of

particular relevance to the case at bar, the Court pointed "[n]ot only [to] the theft, but

also [to Torino's] failure to disclose it" as "violations of the trust imposed upon him" as a

fiduciary.  Id.  The Court explained:

> An officer and director occupies a fiduciary relationship to the corporation
> and its stockholders. . . .   He occupies a position of the highest trust and
> therefore he is bound to use the utmost good faith and fair dealing in all his
> relationships with the corporation. . . .   It is essential to the validity of a
> contract between a fiduciary and a beneficiary concerning matters within

the scope of that relationship that a full disclosure be made of all relevant facts which the fiduciary knows or should know.

Id. at 407–08 (internal quotations and citations omitted).

The Pacelli plaintiffs had suspicions about Torino's trustworthiness and were specifically advised by their accountant not to enter the Settlement "because they did not know enough about the operation of the corporations under Torino."  Id. at 405. While the Connecticut Supreme Court acknowledged the general principle that, "[w]here a party realizes he has only limited information upon the subject of a contract, but treats that knowledge as sufficient in making the contract[,] he is deemed to have assumed the risk of a mistake", it nonetheless refused to give effect to the release provision in the Settlement Agreement.  Pacelli, 189 Conn. at 408 (citing Restatement (Second), Contracts § 154).  As the Court explained,

> The plaintiffs were entitled to assume that the books of the corporations, which were under the control of [the defendant], correctly stated the financial status of the business. . . .[2]  Despite their suspicion of [the defendant], they could also rely upon the fulfillment of his legal duty as a fiduciary to make a full disclosure.  Where there is misrepresentation, the fault of the victim in failing to discover the truth does not preclude relief unless it is so extreme as to amount to a failure to act in good faith and in accordance with reasonable standards of fair dealing. . . .  The misjudgment of [the plaintiffs] did not rise to such a level.

---

[2] In support of this conclusion, the Court cited to a Connecticut General Statute which has since been repealed.  See Conn. Gen. Stat. § 33–307(a) (1994) (repealed) ("Each corporation shall maintain correct and complete books and records of account and shall keep minutes of the proceedings of its incorporators, shareholders, directors and committees of directors.").  However, Connecticut statutes in force today do not undermine the Court's conclusion.  See Conn. Gen. Stat. § 33-945(a–b) ("A corporation shall keep as permanent records minutes of all meetings of its shareholders and board of directors, a record of all actions taken by the shareholders or board of directors without a meeting and a record of all actions taken by a committee of the board of directors in place of the board of directors on behalf of the corporation. . . . A corporation shall maintain appropriate accounting records."); see also Conn. Gen. Stat. § 33-756 ("[A] director who does not have knowledge that makes reliance unwarranted is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, prepared or presented by . . . [o]ne or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the functions performed or the information, opinions, reports or statements provided.").

11

Id. at 408–09 (internal citations omitted).

Admittedly, there are some factual differences between Pacelli and the Complaint in this case.  For example, in Pacelli, the trial court had reasoned that the defendant's actions in opening the secret bank account when he was President and misappropriating the corporate funds was "something the plaintiffs [had taken] their chances on as they were well aware of such a possibility from their accountant and their knowledge of the background of the case."  Id. at 406.  Here, SummerHaven's Complaint alleges that Schultz had a duty to disclose liabilities during the withdrawal negotiations, and that they had no reason to believe they were missing information. Further, unlike the defendant in Pacelli, the facts as alleged in SummerHaven's Complaint do not suggest that there was any inkling of fiduciary breach or fraud on behalf of Schultz at the time the Withdrawal Agreement was drafted and signed.  The court need not conduct a textual analysis of the Mutual release, nor inquire into whether SummerHaven nonetheless suspected Schultz's fiduciary breaches or fraudulent activity when drafting the Release, as it has alleged fraud in the creation of the Withdrawal Agreement itself, in breaching the fiduciary duty to disclose.  Id. at 407-08 ("It is essential to the validity of a contract between a fiduciary and a beneficiary concerning matters within the scope of that relationship that a full disclosure be made of all relevant facts which the fiduciary knows or should know."); Compl. at ¶ 54 (Doc. No. 18) ("In granting Schultz the Withdrawal Agreement . . . SummerHaven relied to its detriment on Schultz's false representations that he had no debts or liabilities to the firm" and it "would not have entered into the Separation [sic] Agreement" had it known about Schultz's actions); Pl.'s Mem. at 10 (Doc. No. 25) ("the release provision did not

contemplate any existing claims but was itself induced, together with the other terms of

the Withdrawal Agreement, based on Schultz's fraudulent conduct").

As the Connecticut Supreme Court stated: "fraud vitiates all contracts, written or

verbal and sealed or unsealed." Id. at 409.  This is particularly true in the case of

fiduciaries like Schultz, for whom the duty to disclose is paramount.  "This principle

[was] certainly applicable to the stipulated judgment and general release relied upon by

the defendant" in Pacelli.  Id. at 409.  It applies here as well.

Therefore, Schultz's Motion to Dismiss (Doc. No. 23) is denied.

B.      Motion to Seal

Schultz moves to seal Exhibit A and Exhibit B, attached to his Memorandum of

Law in Support of his Motion to Dismiss (Doc. No. 23-1).  See Mot. to Seal (Doc. No.

21).  His Motion is granted in part.  Schultz is ordered to redact all content from Exhibit

A, with the exception of the portions quoted in this opinion above, and docket that

redacted document on the public docket.  The original unredacted document is ordered

filed under seal, along with the entirety of Exhibit B.

## V.      CONCLUSION

For the reasons stated above, Schultz's Motion to Dismiss (Doc. No. 23) is

denied, and his Motion to Seal (Doc. No. 21) is granted in part.

**SO ORDERED.**

Dated at New Haven, Connecticut this 3rd day of August 2022.


                                          ___/s/ Janet C. Hall_____
                                          Janet C. Hall
                                          United States District Judge